UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

GEORGE LEIFER,

                        Plaintiff,              CV-04-571 (CPS)

      - against -              MEMORANDUM AND
                                      OPINION

NEW YORK STATE DIVISION OF PAROLE, and
JAMES DRESS, in his official and
individual capacities,

                        Defendants.

----------------------------------------X

SIFTON, Senior Judge.

    Plaintiff George Leifer ("Leifer") brings this action
against defendants the New York State Division of Parole
("Division") and James Dress ("Dress"), the Regional Director of
the Queens, Brooklyn and Staten Island areas of the Division,
alleging violations of Title VII of the Civil Rights Act of 1964,
as amended, 42 U.S.C. 2000e et seq. ("Title VII"), 42 U.S.C. §§
1981 and 1983, the New York State Human Rights Law, New York
Executive Law § 290 et seq. ("NYSHRL"), and the New York City
Human Rights Law, N.Y.C. Administrative Code §8-101 et seq.
("NYCHRL"). Specifically, plaintiff claims that defendants
discriminated against him based on his religion and retaliated
against him for complaining about the discrimination.

    Presently before the Court is defendants' motion for summary

judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, defendants' motion for summary judgment is granted.

**BACKGROUND**

The following facts are taken from the parties' depositions, affidavits, exhibits, and Local Rule 56.1 statements. Disputes are noted.

The Division of Parole is the New York State Agency responsible for the supervision of inmates released from New York State prisons before the completion of their prison sentences. Defendant Dress is the Regional Director of the Queens, Brooklyn, and Staten Island geographic areas. Plaintiff is a Jewish male who began working for the Division as a Parole Officer ("PO") in September of 1987. In August of 1993, plaintiff was promoted to the position of Senior Parole Officer ("SPO"). As an SPO, plaintiff supervises other POs and their caseloads. In September 2001, plaintiff requested and was granted a transfer from the Manhattan II office to the Queens Metro I Area ("Queens 1"). Jay Powers ("Powers"), the Bureau Chief of Queens 1, advised plaintiff that he would not be "stepping into the Garden of Eden" by transferring because there were "serious staff problems" in the Queens office. (Dep. of plaintiff 3/31/05, p. 8, Defendants' Exhibit F).

Shortly after plaintiff's transfer to Queens 1, the Division

scheduled a meeting for the Jewish holiday of Rosh Hashanah, which fell on September 19, 2001. Plaintiff notified his supervisors that the meeting date was scheduled for a Jewish holiday and asked that it be rescheduled. The meeting was not rescheduled. However, plaintiff was not penalized for his absence. On September 20, 2001 plaintiff wrote a memorandum to Powers and the Deputy Regional Director Angela Jimenez ("Jimenez"), requesting that future meetings not be scheduled on Jewish holidays, and that a second meeting be arranged for the benefit of those SPOs who were unable to attend the first meeting due to religious observance. (Defendants' exhibit L). Defendant Dress received a similar memorandum. (Defendants' exhibit Q.) Although defendant Dress states that he directed Powers to ensure that plaintiff was informed of what happened at the meeting, plaintiff alleges that Powers (who is now deceased) failed to do so.

On November 28, 2001, plaintiff attended several meetings held at Queens 1, along with Jimenez, Powers, and several of the POs under plaintiff's supervision. (Defendants' Exhibit G). Plaintiff alleges that at these meetings he was "blame[d] for the behavior of Defendant,"[1] and that this encouraged his subordinates to question his authority. Defendants contend that the meetings were held to address various complaints from the

---

[1] Plaintiff does not make clear to what "behavior" he refers.

plaintiff regarding the behavior of his subordinates.
(Defendants' Exhibit O, ¶¶ 25-26). An undated "Petition for
Relief" was submitted by four POs under plaintiff's supervision
requesting that plaintiff undergo sensitivity counseling, cease
his "unprofessional behavior of posturing and harassment," and be
removed from Queens 1. (Defendants' Exhibit H). Following the
meetings, Robert Oeser from the Division's Employee Relations
office concluded in a December 4, 2001 report that "[t]he
systemic problems in the unit need to be resolved at a regional
level," and that "any successful strategy for resolution would
need to include counseling and training for SPO Leifer."
(Defendants' Exhibit G).

Three weeks later, on December 26, 2001, plaintiff filed a
Grievance alleging that the Division allowed his subordinates to
be hostile and disrespectful to him,[2] undermining his ability to
discipline them. At a January 14, 2002 meeting with defendant
Dress regarding the Grievance, at which Dress also addressed
plaintiff's complaints about the September 19, 2001 meeting,
plaintiff alleges that Dress stated: "What gives you the audacity
to protest my supervisor's meeting? Your religious laws and

_____

[2] Particular instances of insubordination involved "point[ing] a finger
in [plaintiff's] face, putting feet on [plaintiff's] desk, laughing at
[plaintiff's] instructions, refusing to provide information about job related
activities about which [plaintiff is] entitled to know, refusing to provide
[plaintiff] with a home telephone number, raising one's voice argumentatively,
failing to contribute to a case conference, reading a magazine or pretending
to read a magazine during a case conference, [and] telling [plaintiff] to get
out of [one's] office." (Memo Dress to Leifer, Defense Exhibit K.)

customs are not binding on me. I will not reschedule meetings because of some Jewish holiday." Defendant Dress denies having used such language, and states that he merely explained that in deciding when to schedule a meeting the "personal observances of individual employees [are] a lesser factor than some of the larger concerns facing Parole."

On January 17, 2002, defendant Dress issued a Decision on plaintiff's Grievance. Although Dress noted that plaintiff's allegations concerning the Division's misconduct were unproven, he agreed that the plaintiff "should not have to work in or be subjected to the type of hostile environment" described, and determined that the regional office would "monitor the ongoing situation" (Defendants' Exhibit K). Dress declined to implement plaintiff's suggestion that one of plaintiff's subordinates be transferred, and rejected plaintiff's contention that plaintiff's supervisors were not responsive to his requests for assistance.

On January 28, 2002, Bureau Chief Powers sent plaintiff a counseling memorandum, criticizing plaintiff for two incidents in late January regarding a new parole officer under his supervision, PO Marcelin.[3] Plaintiff alleges that this counseling

---

[3] One incident involved a notice regarding the arrest of one of PO Marcelin's parolees. The arrest was for several offenses, including two violent felonies. Powers placed the notice of arrest on plaintiff's desk, and upon his arrival plaintiff put the notice in PO Marcelin's mail bin without mentioning it to her. Roughly three hours after the Arrest Notice was placed in PO Marcelin's mail bin, Powers became aware that she had not yet taken action on it. Powers reprimanded plaintiff for not having brought the Arrest Notice to PO Marcelin's attention. Because the parolee had been arrested five days earlier and could have made bail, Powers considered it imperative that PO

memorandum was issued in retaliation for plaintiff's religious discrimination complaint,[4] and that the actions for which he was cited were not standard violations of any "manual item, policy or procedures." (Defendants' Exhibit J). Plaintiff further alleges that the fact that he was reprimanded for mistakes made by his subordinate, who was not herself counseled, is evidence of an improper purpose behind the reprimand. Because Powers did not follow the required protocol of meeting with Leifer prior to issuing the counseling memorandum, the memorandum was subsequently withdrawn.

For the period of August 12, 2001 through August 12, 2002, plaintiff received what he considered to be a negative personnel evaluation. Defendants state, and plaintiff does not dispute, that plaintiff's evaluation was "satisfactory." However, plaintiff maintains that it contained "attacks and punishing language."[5]

---

Marcelin pay close attention to whether the parolee reported. The second incident occurred the following day when Powers was reviewing the file of another of PO Marcelin's parolees and discovered that the warrant for his arrest had not been signed by plaintiff and notarized and was therefore illegal. Because of PO Marcelin's inexperience Powers felt that it was important for plaintiff to take an active supervisory role in her cases. (Defendants' Exhibit I).

[4] Plaintiff must refer here to his memorandum to his supervisors requesting that meetings not be scheduled on Jewish holidays or some other complaint. The first formal complaint of religious discrimination documented in the parties' submissions is a complaint to the State Division of Human Rights dated March 10, 2003 (Defendants' Exhibit C).

[5] Plaintiff received the following review in the comments portion of the evaluation form: "SPO Leifer requires regular assistance and oversight in managing his unit - which rarely meets contact standards. He demonstrates adequate competence in case management and dealing with most problems related

On January 2, 2003, the Division issued a Notice of Discipline to plaintiff for mishandling the routine transfer of a parolee.[6] Plaintiff challenged the Notice. It was eventually affirmed in arbitration, although the Arbitrator reduced the penalty from thirty days suspension without pay to two days of suspension without pay (Defendants' Exhibit Z).

On January 27, 2003 and again on February 6, 2003, shortly after the Notice of Discipline was issued, plaintiff alleges that PO Redd, one of his subordinates, came by his office and shouted "Suspension! Suspension! Suspension!" Plaintiff alleges that his supervisors told his subordinates about the suspension in an attempt to undermine his authority. Defendants deny knowledge as to how PO Redd acquired information regarding plaintiff's suspension.

Plaintiff filed a complaint, dated March 10, 2003, with the New York State Division of Human Rights ("SDHR") alleging religious discrimination by the Division.[7] (Defendants' Exhibit

---

to his caseload but requires frequent guidance, advice and focus. Notwithstanding the above, SPO Leifer is well motivated and generally understands and takes his responsibilities seriously." (Defendants' Exhibit Y).

[6] In February of 2002, plaintiff transferred a case but failed to pass on information regarding a parolee's history of domestic violence. The Bureau that took on the file did not monitor the parollee as they would have if they were on notice of his history of violence. On July 16, 2002 the parollee stabbed his wife to death. The parole officer who received the file was also disciplined. (Defendants' Exhibit Z).

[7] The parties have not provided information regarding the outcome of plaintiff's complaint with SDHR. However, defendants do not allege that plaintiff failed to exhaust his administrative remedies.

C).

Plaintiff alleges that at a March 27, 2003 meeting, defendant Dress stated: "You are different. You are not like the rest of us. You don't fit in here...You don't curse. You don't scream and yell at people, yet you are dangerous...You are like Saddam Hussein." Dress denies making such a statement.

In April of 2003, a training program on new drug testing equipment was scheduled for June 6, 2003, the Jewish holiday of Shavuot. Plaintiff notified his supervisors that he would be unable to attend as he would be observing the Jewish holiday, and his absence was excused. Plaintiff alleges that he requested that he be allowed to attend the training for another bureau, and his request was denied. Defendant contends that employees who could not attend the June 6 training were allowed to attend training in other bureaus, or were trained by a colleague. Plaintiff maintains that he never received training on the new drug testing equipment.

In September of 2003, plaintiff's wedding picture, which he kept on his desk at the Division, was vandalized. An unknown person drew horns on plaintiff's head and a beard on his wife's face. Plaintiff notes that this act had anti-Semitic overtones.[8]

_____

[8] Plaintiff does not explain his position that the vandalism was anti-Semitic. Presumably he refers to the derogatory stereotype that Jews have horns. *See e.g. Challenging Anti-Semitism: Debunking the Myth and Responding with Facts*, http://www.adl.org/education/curriculum_connections/spring_2006/ Anti-Semitism%20Past%20and%20Present%20Handouts.pdf at page 5. *See also Michelangelo, Mid Years, The Tomb of Julius II*, http://michelangelo.com/buon/

Although the Division's Office of Professional Responsibility
(OPR) conducted an investigation at the time of the incident and
a second investigation in 2005,[9] plaintiff alleges that the
investigations were "very minimal and absolutely inappropriate,"
and that the defendant should have examined his wedding
photograph for fingerprints as part of the investigation. A few
months earlier plaintiff found a crowbar in his office file
cabinet,[10] and what he believed to be urine on his desk chair.
Defendants investigated the incident involving the chair,[11] and
maintain that plaintiff never requested an investigation
regarding the crowbar. Plaintiff claims that defendants failed to
adequately investigate these incidents and that defendants should
have conducted DNA testing on his chair.

In February of 2004 plaintiff was notified that his
testimony would be required at an April 9, 2004 hearing regarding

---

bio-index2.html?http://www.michelangelo.com/buon/bio-mid.html ("Michelangelo's
'Moses' has horns because one of the biblical translations of "rays of light"
became "horns" in Italian. Because of this mistranslation, depictions of Moses
with horns became somewhat commonplace.")

[9] Plaintiff emailed OPR in 2005 alleging that one of the POs had
provided new information regarding the perpetrator of the vandalism. OPR
reopened the investigation, but when interviewed, the PO denied having any
information regarding the vandalism of plaintiff's wedding picture.

[10] Plaintiff suggests two reasons why a crowbar in his file cabinet is a
hostile action. Plaintiff sees the crowbar as either an attempt at
intimidation, or an attempt to get him in trouble because parole officers are
only allowed to have certain types of weapons while on duty. (Dep. of
plaintiff 3/31/05. Defendants' Exhibit F.)

[11] Plaintiff alleges that at the time he noticed the wet spot on his
chair he was informed by a secretary that it was urine. OPR interviewed the
secretary who denied having made such a statement.

a subordinate who had physically threatened him. As April 9, 2004 was one of the intermediate days of Passover, plaintiff requested additional lunch time from his supervisor in order to eat at a Kosher establishment. Plaintiff alleges that Defendants' employee Robert Oeser told plaintiff: "[I]f I allow you to do this, my whole day is ruined...this is your problem...request denied." Oeser denies making any such statement (Defendants' Exhibit O, ¶¶ 19-20). In a memo dated February 24, 2004, Jose Burgos, the Director of Human Resource Management informed plaintiff that he would no longer be required to testify at the hearing. (Defendants' Exhibit V). The Division subsequently withdrew the charges against the subordinate. Plaintiff alleges that by dropping the charges against his subordinate, defendant undermined his ability to supervise his staff.

Plaintiff further alleges that in late March of 2004 the Acting Bureau Chief of Queens 1, Patrick Hoy ("Hoy"), told plaintiff: "Leifer, your friend Lerner filed false reports against me...he tried to play the anti-Semitism card...(laugh)...and he came up short...(laugh)...there are remedies against those who file false complaints and I am looking into it." Hoy denies making any such statement, and plaintiff never notified the Division of Hoy's alleged comments. Plaintiff also alleges that in March of 2004 Hoy demanded that plaintiff remove photographs of President Bush and Governor Pataki with

Menorahs from his office wall. Plaintiff further alleges that Hoy had him investigated based on a false complaint, deliberately lost several months of plaintiff's time cards resulting in the withholding of plaintiff's paycheck, and rescinded plaintiff's discipline of two subordinates, encouraging them and others to disregard plaintiff's instructions.

Sometime in 2004 plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC").[12] (Defendants' Exhibit C). On May 28, 2004, after being informed of this lawsuit, the EEOC dismissed the case and provided plaintiff with a Notice of Right to Sue. (Plaintiff's Exhibit L).

On October 17, 2005, the eve of the Jewish holiday of Sukkot, plaintiff was scheduled to appear with a parollee at a Parole Hearing. Plaintiff allegedly requested that he be allowed to leave early in order to attend evening religious services.[13] Although plaintiff believes the Hearing Officer requested that plaintiff's case be heard earlier in the day, plaintiff alleges that it was not and he was unable to attend the evening service.

**DISCUSSION**

<u>Jurisdiction</u>

This Court has jurisdiction over the present action pursuant

---

[12] The parties' Rule 56.1 statements agree that plaintiff filed a complaint with EEOC "on or about March 2004 or June 16, 2004," although by May 28, 2004 the EEOC had dismissed plaintiff's case. (Plaintiff's Exhibit L).

[13] It is not clear to whom plaintiff made this request.

to 28 U.S.C. § 1331, which creates jurisdiction over civil actions arising under federal law; 28 U.S.C. § 1343, which creates jurisdiction over actions arising under 43 U.S.C. § 1983; and 28 U.S.C. § 1367, which creates supplemental jurisdiction over claims arising under state law.

### Summary Judgment Standard

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Village of East Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id*.

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences

therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). In deciding such a motion the trial court must determine whether "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). "The salutary purposes of summary judgment--avoiding protracted, expensive and harassing trials--apply no less to discrimination cases than to...other areas of litigation," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) and courts have often noted that it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citing *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466

(2d Cir. 2001)).

<u>Plaintiff's Claims</u>

Plaintiff alleges violations of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq. ("Title

VII"),[14] 42 U.S.C. §§ 1981[15] and 1983,[16] the New York State Human

Rights Law, Executive Law § 290 et seq.[17] and the New York City

_____

[14] Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.
     Title VII also makes it unlawful for an employer "to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3

[15] "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981

[16] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983

[17] N.Y. Exec. Law § 296 provides:

It shall be an unlawful discriminatory practice:

(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

. . .

Human Rights Law, N.Y.C. Administrative Code § 8-101 et seq.

("NYCHRL")[18]. Specifically, plaintiff claims that (1) defendants

discriminated against him based on his religion; and (2) that

defendants retaliated against him for complaining about the

alleged religious discrimination.

*Title VII Claims against Defendant Dress*

Defendants argue that plaintiff's Title VII claims must be

dismissed as to defendant Dress because Title VII claims cannot

be maintained against individual defendants.[19]

It is well settled that an employer's agents, even those in

supervisory positions, cannot be held individually liable under

Title VII. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1312-13 (2d

Cir.1995), *abrogated on other grounds by, Burlington Indus. Inc.

v. Ellerth*, 524 U.S. 742; *Woods v. Ruffino*, 8 Fed.Appx. 41, 42

(2d Cir. 2001); *Mandell v. County of Suffolk,* 316 F.3d 368, 377

---

    (e) For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

N.Y. Exec. Law § 297(9) provides, "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages . . . ."

    [18] New York City Administrative Code § 8-107 provides: "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Code § 8-107(1)(a).

    [19] Plaintiff does not respond to this argument.

(2d Cir. 2003). Accordingly, the Title VII claims must be dismissed as to defendant Dress.

*Discrimination Claims against Defendant Division*[20]

Title VII prohibits discrimination in employment based on an employee's religion. Religion is broadly defined to include "all aspects of religious observance and practice, as well as belief," although an employer is not required to accommodate an employee's religious practices if the employer can demonstrate that he is unable to do so "without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). To succeed on a Title VII discrimination claim, the plaintiff must first offer "evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 (1977). In producing such evidence, a plaintiff establishes a prima facie case, creating a presumption of discrimination which shifts the burden of production to the defendants. The defendants must then present a legitimate, non-discriminatory reason for the adverse employment action to

---

[20] "[E]mployment discrimination claims brought pursuant to §§ 1981 and 1983...are evaluated under the same analytical framework as those brought under Title VII." *Jessamy v. City of New Rochelle*, 292 F.Supp.2d 498, 511 n. 15 (S.D.N.Y. 2003)(internal citations omitted). Moreover, liability for purposes of Title VII and New York State and City human rights laws is essentially identical. *Tomka,* 66 F.3d at 1304 n.4; *McCoy v. City of New York*, 131 F. Supp. 2d 363, 375-76 (E.D.N.Y. 2001). Consideration of claims brought under New York State and City Human Rights Laws parallels the...framework applied to Title VII claims. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000); *Landwehr v. Grey Adver., Inc.*, 211 A.D.2d 583 (N.Y. App. Div. 1995). Accordingly, these claims will be addressed together.

rebut the presumption. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 279-80 (1981). The burden then shifts to the plaintiff to prove that the stated reason is pretext, and "that discrimination was the real reason for the employment action." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citing *Burdine*, 450 U.S. at 256; *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir. 1997) (en banc), cert. denied, 522 U.S. 1075 (1998).

Plaintiff alleges discrimination under three different theories: (1) failure to make reasonable accommodations for the religious practices of employees; (2) creation of a hostile work environment; and (3) disparate treatment. Plaintiff further alleges that he was retaliated against for lodging complaints regarding religious discrimination by the Division. I address each of these claims below.

*Reasonable Accommodations*

To make out a prima facie case of discrimination alleging that an employer failed to reasonably accommodate the plaintiff's religious practices, the plaintiff must show that (1) he held a bona fide religious belief conflicting with an employment requirement; (2) he informed his employers of this belief; and (3) he suffered an adverse employment action for failure to comply with the employment requirement that conflicted with his belief. *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir.

2006). "An 'adverse employment action' is one that materially changes the terms and conditions of employment." *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)(quoting *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997)). "[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006)(citing *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997)(no bright line rules)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citing *Crady v. Liberty National Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)). Adverse employment actions may also include reprimand. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)(citations omitted); *see also Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 446 (noting that reprisals by employers less flagrant than job termination or reduced wages or benefits may also be adverse). However, "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities" to

constitute an adverse employment action. *Galabya,* 202 F.3d at 640.

Plaintiff alleges that in scheduling the September 19, 2001 meeting on Rosh Hashanah, and the June 6, 2003 training session on Shavuot, the defendants subjected plaintiff to an adverse employment action in that they forced plaintiff to "choose between his religion and his work." However, plaintiff presents no evidence that his reputation or opportunities for advancement or earning potential were affected, or that defendants' action caused any material change in the terms or conditions of his employment. Assuming that plaintiff was effectively denied training on new drug testing equipment, there is no showing that this training was so vital to the performance of plaintiff's supervisory duties as to constitute a material change in the terms and conditions of his employment. There is no showing at all as to what occurred at the September 19 meeting of such significance as to alter the terms and conditions of his employment. Moreover, by granting plaintiff leave for the holidays, the Division satisfied its duty to make reasonable accommodations for plaintiff's religious practices. See *Man-of-Jerusalem v. Hill*, 769 F. Supp. 97, 100-101 (E.D.N.Y. 1991) (granting employees unpaid leave for religious holidays is reasonable accommodation). Title VII does not require an employer to accommodate the religious practices of its employees in the

precise way in which the employee desires. "Where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not show that each of the employee's alternative accommodations would result in undue hardship." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986).

Although plaintiff alleges that defendant stated that he would not be allowed an extended lunch for Passover during the April 9, 2003 hearing at which he was required to testify, the hearing never actually occurred. Plaintiff has thus failed to show that his religious beliefs were not reasonably accommodated by the Division.

*Hostile Work Environment*

The Supreme Court has interpreted Title VII to prohibit "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). To succeed on a hostile work environment claim, a plaintiff must show, first, that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id*. at 21. Factors to be considered in determining whether an environment is hostile or abusive include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with
an employee's work performance." *Harris*, 510 U.S. at 23. Although
"the incidents comprising a hostile work environment claim need
not make reference to any trait or condition on the basis of
which the discrimination has occurred," they must occur under
circumstances under which "the incidents can reasonably be
interpreted as having taken place on the basis of that trait or
condition." *Svenningsen v. College of Staten Island*, No.
01-CV-7550, 2003 WL 21143076, *2 (E.D.N.Y. 2003); See *Gregory v.
Daly*, 243 F.3d 687, 694-695 (2d Cir. 2001). Isolated incidents of
offensive conduct are generally inadequate to establish a
discrimination claim, and plaintiff must show "either a single
incident was extraordinarily severe, or that a series of
incidents was sufficiently continuous and concerted" to cause a
change in the work environment. *Howley v. Town of Stratford*, 217
F.3d 141, 153 (2d Cir. 2000)(citing *Cruz v. Coach Stores, Inc.*,
202 F.3d 560, 570 (2d Cir. 2000)). Under these tests, it is, at
the least, a jury question whether plaintiff suffered a hostile
work environment as a result of the misconduct of his fellow
workers.[21] For example, although it is not the only possible

---

[21] In addition to those instances listed at footnote 2, supra,
plaintiff's subordinates allegedly: opened a window in his office without his
permission, in the process knocking over and not picking up one of plaintiff's
possessions; stated "you really stink Leifer, do you bathe regularly?;" stated
good morning, and when plaintiff responded good morning replied "I'm talking
to PO Uretsky, not you Leifer;" and closed the door in plaintiff's face.
(Defendant's Exhibit AA).

interpretation, a reasonable jury could interpret the drawing of horns around defendant's head on his wedding picture as anti-Semitic. However, after establishing that a hostile work environment resulting from discrimination existed, a plaintiff must show that there is a specific basis for imputing the discriminatory conduct to his employer. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996). It is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).

Plaintiff alleges several interactions with his supervisors in which his religion or Semitic background is implicated: Defendant Dress' statement in January 2002 that Jewish laws and customs were not binding on him and that he would not reschedule meetings because of Jewish holidays; his statement two years later that "you are not like the rest of us . . . You are like Saddam Hussein"; the failure to apprehend the individual defacing plaintiff's wedding photo in September 2003; defendant's employee Oeser's initial refusal to grant plaintiff an extended lunch hour for Passover in February of 2004; Acting Bureau Chief Hoy's directive that plaintiff remove pictures from his wall displaying political figures near Menorahs; and Hoy's statement in March of 2004 about filing false complaints of anti-Semitism.

While each of these interactions relate or refer to plaintiff's religion or ethnic background, none (with the possible exception of the reference to Saddam Hussein) express hatred, contempt, or hostility. Considering the Saddam Hussein comment together with the others might raise a reasonable suspicion that defendants harbored a discriminatory animus toward plaintiff. However, whether taken singly or together these incidents do not supply a basis on which a reasonable juror could infer that defendants, more likely than not, failed to stop the hostile environment created by plaintiff's subordinates because they were motivated wholly or in part by hostility occasioned by plaintiff's religion or ethnicity. Plaintiff has failed to show that these infrequent and relatively benign incidents were causally related to the hostile work environment in which plaintiff worked or unreasonably interfered with his work performance or altered the conditions of his employment. Plaintiff's difficulties with his subordinates predated these comments, and plaintiff has shown no change in his work environment based on these few arguably discriminatory comments by his supervisors.

Courts have granted summary judgment where significantly more severe instances of discrimination were alleged. In *Shabat v. Blue Cross Blue Shield*, 925 F. Supp. 977 (W.D.N.Y. 1996), *aff'd sub nom Shabat v. Billotti*, 108 F.3d 1370 (2d Cir. 1997),

plaintiff's claims were dismissed despite comments from coworkers
and supervisors asking the Jewish Israeli plaintiff whether
people from the Mideast beat their wives; asking why he could not
accept Jesus Christ as the Messiah since Jesus was also Jewish;
stating that there was no such holiday as Yom Kippur; asking
plaintiff who he had killed to make "matzah cake," an "allusion
to a once-common myth spread by anti-Semites that Jews killed
children and used their blood when baking matzah for Passover;"
and rebuking plaintiff for inviting coworkers to the "barbaric
ceremony" of his son's circumcision. *Shabat v. Blue Cross,* 925 F.
Supp. at 982. In affirming the trial court's decision, the Second
Circuit found "particularly significant the facts that...the
incidents perceived by plaintiff to evidence anti-Semitic and
anti-Israeli animus were relatively few in number (roughly nine),
and they occurred over a three and one-half year period...."
*Shabat v. Billotti*, 108 F.3d 1370 at *1. Similarly, plaintiff
here alleges a limited number of incidents occurring over an
extended period of time.

In his papers and at oral argument, plaintiff cites *Mandell
v. County of Suffolk*, 316 F.3d 368, 373 (2d Cir. 2003) for the
proposition that "alleged epithets and demeaning invective
directed at a plaintiff by his or her superiors or co-workers
can, if believed by a factfinder, subject an employer to legal
liability for discrimination." In *Mandell* the alleged epithets

included "'that Jew' and 'Jewboy' and being told that all Jews stick together," as well as "virulent anti-Semitic remarks directed at other Jews, such as "f***ing Jews" and "f***ing Jew lawyer." *Mandell*, 316 F.3d at 374. The demeaning treatment in *Mandell* also included an instance where "another officer tossed a dime on the floor before [the plaintiff] to see if he would stoop down to pick it up...which was a reference to the demeaning ethnic stereotype that Jews are 'cheap.'" *Id*. at 378. Plaintiff alleges no language or actions either on the part of the defendant or its employees that are comparable to the "epithets and demeaning invective" described in *Mandell*.

*Disparate Treatment*

A disparate treatment claim arises when there is either (1) an adverse job action under circumstances giving rise to an inference of discrimination on the basis of religion; or (2) harassment on the basis of religion that amounts to a hostile work environment. *Feingold v. State of New York*, 366 F.3d 138, 149-150 (2d Cir. 2004). Plaintiff does not make clear under which standard he claims disparate treatment, but in either case his claim must fail because he has shown neither an adverse job action nor a hostile work environment resulting from defendants' discriminatory animus.

*Retaliation*

To state a prima facie case of retaliation, plaintiff must show (1) that he was engaged in a protected activity, (2) that his employer was aware of that activity, (3) that he suffered an adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988). In *De Cintio v. Westchester County Medical Center*, 821 F.2d 111 (2d Cir. 1987), *cert. denied*, 484 U.S. 965 (1987), the court explained that [proof] of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir. 1986), or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1188-89 (11th Cir.), *cert. denied*, 474 U.S. 981 (1985), or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant. *Id*. at 115 (emphasis in original).

Retaliation claims follow the same burden shifting analysis as other discrimination claims. Once a plaintiff has established a prima facie case of retaliation, the burden of production then shifts to the defendant to state a "legitimate non-discriminatory

reason" for the action. *De Cintio,* 821 F.2d at 115. If defendant

offers such a reason, plaintiff must then show that defendant's

proffered reason is pretextual, and that its actual reason was

retaliation. *Id* at 115.

Defendants argue that plaintiff's retaliation claims must be

dismissed as a matter of law because plaintiff has not shown that

there was any adverse employment action. Plaintiff alleges that

following his complaints about the scheduling of the September

19, 2001 meeting on Rosh Hashanah defendant began complaining of

his work performance. Plaintiff argues that Powers' counseling

memorandum was issued shortly after plaintiff's complaints of

religious discrimination. However, in fact, plaintiff sent Powers

a memorandum complaining about the scheduling of a meeting on

Rosh Hashanah on September 20, 2001. (Defendant's Exhibit L).

Powers issued his counseling memorandum more than four months

later on January 28, 2002. Moreover, since this memorandum was

subsequently withdrawn, it cannot be considered an adverse

employment action. Although plaintiff's evaluation for the period

of August 2001 through August 2002 was not "excellent," it was

"satisfactory," and in all events cannot itself constitute an

adverse employment action. *Alfano v. Costello*, 294 F.3d 365, 376

(2d Cir. 2002) (evaluations of "good" rather than "excellent" do

not support an inference of mistreatment). Plaintiff has not

alleged that he suffered "a termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Galabya*, 202 F.3d at 640. In fact, plaintiff alleges no changes whatsoever in his employment duties or compensation between the time he started working at Queens 1 and the present.

Plaintiff also alleges that Defendant Dress verbally reprimanded him for complaining about the scheduling of a meeting on a Jewish holiday. Although reprimand may constitute an adverse employment action, *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999), in the context of this case the reprimand is not enough since it did not itself reflect or lead to "a materially adverse change in the terms and conditions of employment." *Richardson v. New York State Dept. Corr. Svcs.*, 180 F.3d 426, 446 (2d Cir. 1999).

Plaintiff also alleges that following his absence for Rosh Hashanah he was verbally reprimanded regarding his interactions with the POs under his supervision. However, defendants have presented evidence that plaintiff did, in fact, have significant difficulty in supervising his subordinates, a non-discriminatory basis for reprimand. To show that this reason is pretextual plaintiff argues that the Division should have disciplined his subordinates, rather than him. However, as an SPO, plaintiff's duties require him to supervise parole officers. That defendant

reprimanded him rather than his subordinates is insufficient to show pretext, since the failure to supervise was his failure not that of his subordinates.

The Notice of Discipline plaintiff was issued in January of 2003 based on his mishandling of a parolee transfer may also be considered an adverse employment action. However, defendants have articulated a non-discriminatory basis for the disciplinary action, namely that plaintiff failed to properly transfer the parollee's file. The decision was affirmed by a neutral arbitrator, and the person to whom the parollee's file was directed was also disciplined. These facts support defendants' non-discriminatory basis for the disciplinary action. Plaintiff has failed to show that this reason was pretextual.

In some cases, a hostile work environment can itself be considered an adverse employment action sufficient to make out a claim of retaliation. *Richardson*, 180 F.3d at 446 ("An employee could suffer a materially adverse change in the terms and conditions of [his] employment if [his] employer knew about but failed to take action to abate retaliatory harassment inflicted by co-workers."). However, as discussed above, plaintiff cannot make out a prima facie showing of a discriminatorily hostile work environment. Plaintiff has presented no evidence to support an inference that any harassment directed at plaintiff by his subordinates was related to his complaints regarding religious

discrimination, and provides only conclusory allegations stating
that such behavior was encouraged and tolerated by the
defendants. Moreover, defendants conducted investigations
regarding the incidents complained of by plaintiff. Accordingly,
defendants are entitled to summary judgment on plaintiff's
retaliation claim as a matter of law.

Because plaintiff cannot show that he was subjected to
religious discrimination or retaliation under any of the above
theories, his Title VII, § 1981, § 1983, state and city law
claims against the Division must be dismissed. Because plaintiff
fails to make a prima facie showing of religious discrimination
by the Division, I will not address whether plaintiff's claims
are barred by the Eleventh Amendment, New York State Executive
Law, or on any other grounds.

*Discrimination Claims against Defendant Dress*

Plaintiff fails to allege any facts upon which defendant
Dress, in his official or individual capacity, can be held liable
for violations of § 1981, § 1983, state or city law, which are
evaluated using the analytical framework applied above. Because
plaintiff relies on identical facts to support all of his claims,
plaintiff's claims against Dress fail for the same reasons as his
claims against the Division. Accordingly, plaintiff's § 1981, §
1983, state and city law claims against Defendant Dress must also
be dismissed.

## CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment is granted in its entirety.

The Clerk is directed to transmit a copy of the within to all parties and to the magistrate judge.

SO ORDERED.

Dated :   Brooklyn, New York
          January 23, 2007

By: /s/ Charles P. Sifton (electronically signed)
    United States District Judge